UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARTFORD AIRCRAFT LODGE 743, | : | |
| INTERNATIONAL ASSOCIATION of | : | CIVIL ACTION NO. |
| MACHINISTS and AEROSPACE WORKERS, | : | 3:05CV00942 (JCH) |
| AFL-CIO, | : | |
|       Plaintiff | : | |
|       v. | : | |
| | : | |
| HAMILTON SUNSTRAND CORPORATION, | : | NOVEMBER 30, 2005 |
|       Defendant | : | |

**RULING RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 18]
AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 25]**

**I. INTRODUCTION**

The present case came before this court by way of the plaintiff Union's Petition
to Compel Arbitration [Dkt. No. 1] of a dispute arising out of a collective bargaining
agreement ("CBA") between the union and the defendant corporation.  The plaintiff is
Hartford Aircraft Lodge 743, International Association of Machinists and Aerospace
Workers, AFL-CIO (the "Union"), and the defendant is Hamilton Sunstrand Corporation
(the "Company").  Both parties have moved for summary judgment.

**II. STANDARD OF REVIEW**

In a motion for summary judgment, the burden lies on the moving party to
establish that there are no genuine issues of material fact in dispute and that it is
entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c)); Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360
F.3d 329, 338 (2d Cir. 2004).  The moving party may satisfy this burden "by showing –

that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993) (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523 (internal citation omitted). Thus, "'[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper.'" Id. (quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991)); see also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) ("Viewing the evidence in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact

2

and entry of summary judgment is inappropriate."). "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment.  Id.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir.1990) (internal quotations and citations omitted). Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible.  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

**III. FACTS**[1]

The Union represents production and maintenance employees at the Company. The relationship between the Union and the Company is governed by the CBA, which is in effect from May 3, 2004 to May 6, 2007.  Bogue Decl. Ex. A [Dkt. No. 20].  Article 1 of the CBA reads,

> It is recognized that in addition to other functions and responsibilities, the Company has and will retain the sole right and responsibility to direct the operations of the Company and in this connection to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the assignment of schedules and hours of work; the methods, processes, and means of manufacturing; and to select, hire, and demote employees, including the right to make and apply rules and regulations for discipline, efficiency, production and safety unless otherwise hereinafter provided.

Id. at 2.

One of the stated purposes of the CBA is to "secure a prompt and fair disposition of grievances so as to eliminate interruptions of work and interference with the efficient operation of the company's business."  Id. at 1.  Article 7 of the CBA sets out a grievance procedure.  Section 1 of this Article begins,

> In the event that a difference arises between the Company, the Union or any employee concerning the interpretation, application or compliance with the provisions of this Agreement, an earnest effort will be made to resolve such difference in accordance with the following procedure which must be followed.

Id. at 13.  Article 7, Section 3 reads in relevant part:

---

[1]To the extent they are undisputed, this section sets forth facts in the parties' local Rule 56(a) statements and accompanying exhibits.  To the extent that potentially material facts are disputed, this section sets forth two versions of the facts, because the parties have both moved for summary judgment on the same claim.  Where the Local Rule 56(a) statements contain typos or other immaterial changes in the text of the CBA or other document that has been provided to the court and whose authenticity is undisputed, the court quotes the language directly from the document.

4

(a)    Any contractual grievance not settled at Written Step 2 of Section 1 of this Article [which lays out procedures for bringing and appealing grievances], shall be submitted to arbitration upon the request of either party hereto filed in accordance with the provisions of this Article and with the exception of Article 1 and Article 28.

(b)    Other grievances arising under this contract which are not settled at Written Step 2 of Section 1 of this Article may be referred to arbitration if the Company and the Union mutually agree in writing.

(c)    Except for the grievances which can be arbitrated under Sections 3(a) and 3(b) of this Article, no disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation or application of the provisions of this Agreement shall be submitted to any Arbitrator for decision.  It is further understood and agreed that no grievance, dispute, misunderstanding or difference between the parties arising out of events which occurred prior to the execution of this Agreement shall be submitted to arbitration under the provisions of this Agreement.

(d)    The decision of the Arbitrator shall be supported by substantial evidence on the record as a whole and shall be final and conclusive and binding upon all employees, the Company and the Union.

(e)    The Arbitrator shall have no power to add to or subtract from or modify in any way any of the terms of this Agreement; nor shall the Arbitrator have jurisdiction in any case submitted to arbitration to affect in any way, directly or indirectly, by any decision or in any other manner, the right and responsibility of the Company to direct its operations; to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the schedules of production; shift schedules and hours of work; the methods, processes and means of manufacturing; or the rules and regulations to be made or applied for production, discipline, efficiency, and safety.

Id. at 18-19.  Article 28, titled "Transfer of Ongoing Production Work," reads:

Section 1.    Where business and economic conditions permit, the Company's intent is to provide the Union with six (6) months advance notice of its intent to close a plant, business unit, operating center or move a product line involving work currently performed by bargaining unit employees.  This expression of intent is not a guarantee to maintain any number of jobs during this period but an expression of the Company's good faith desire to provide as much notice as practical.  Such notice will include identification of the work to be transferred, the expected decrease

5

in the number of represented employees as a direct consequence of the transfer of work and the anticipated date of the transfer of work.

Section 2.     If the Union requests to meet and confer within ten (10) working days following the notice set forth above, the Company will be available to meet and confer with the Union within five (5) working days of such requests.  While these discussions are ongoing, the parties agree the discussions will remain confidential.  The period for meeting and conferring shall not exceed forty-five (45) days except by mutual agreement.  The final decision regarding closing a plant or transferring a business unit rests solely with the company.  When business or economic conditions do not allow the above times, the parties will meet as time permits.

Section 3.     If information is requested by the Union for the meet and confer session(s), the Company will promptly make the following information available to the Union: the express reason(s) for intending to transfer the work and where employment cost is a significant factor, comparative related wages, payroll allowances and employee benefit expenses of represented employees for the work intended to be transferred and of their counterparts who would be assigned to the work. This information will be treated as confidential by the Union.

Id. at 2.

Twenty-seven Letters of Agreement are attached to the CBA.   Letter 21 is titled

"Union-Management Committee on Productivity, Competitiveness and Job Security."  It

reads in relevant part:

This is to confirm the understanding and agreement between the Company and the Union concerning job security issues in an environment of business growth and change.

It is understood and agreed by the parties that Hamilton Sundstrand's Aerospace Operations are engaged in an industry that has been marked by business consolidations and increased competition.  It is difficult, if not sometimes impossible, to predict business developments that may impact the Company and the bargaining unit during the term of the present Agreement.  Nevertheless, the Company agrees during the life of this Agreement that it will continue to employ bargaining unit members at its facilities in Windsor Locks.  This guarantee does not apply in the event of economic conditions beyond the control of the company or acts of God (fire, floods, etc.).

It is in the mutual interest of both parties for the Company to be more competitive in the global marketplace, thereby providing enhanced job security for bargaining unit employees. . . .

The joint Union/Management Committee ["Committee"] established under the prior Agreement will be continued.

A.   The Union members of the Committee shall be a representative from the International Union, the District 26 Directing Business Representative, the President, Vice President, Recording Secretary and Secretary-Treasurer of Local Lodge 743.  The Company members of the Committee shall be the Vice President – Human Resources, Director of Mechanical Operations, Plant Manager – Worldwide Repair, Windsor Locks, Director of Operations – Space Systems, and Director, Human Resources.

B.   The Committee will meet every other month, unless otherwise mutually agreed, for the purpose of reviewing the state of the business and to study any problems affecting productivity, competitiveness, or job security.  More frequent meetings may be held on mutual agreement of the parties.  Included in such discussions will be consideration of work that is currently being performed by vendors and could potentially be brought in-house.  In addition, the parties agree to discuss technological changes that can help the Company be more competitive in the marketplace, which enhances job security.  This Committee will cooperate to minimize any adverse effects these changes may have on employees.

C.   In addition to A and B above, the Committee will study, and, where appropriate, recommend various cooperative approaches to enhance the Company's competitiveness and productivity, and thus job security. . . .

D.   The Committee shall have access to information concerning manufacturing costs, productivity, scheduling, business and staffing plans affecting the bargaining unit and such other information as mutually deemed relevant by the parties.  Any such information must be kept confidential by Union members of the committee. . . .

Bogue Decl., Ex. A at 181-82 [Dkt. No. 20].  Although they dispute the semantics of

how Letter 21 was incorporated into the CBA, both parties agree that it is part of the

7

CBA for arbitration purposes.[2]  Letter 21 was written by the Company's Human Resources Director and "countersigned as 'accepted' by representatives of the Union." Def.'s Local Rule 56(a)1 Statement ¶ 10 [Dkt. No. 19]; see Plf.'s Local Rule 56(a)2 Statement ¶ 10.[3]  All of the Letters of Agreement are included in the table of contents of the CBA.  The pages of the Letters are numbered consecutively with those of the preceding articles, schedules, appendices, and other sections of the CBA.

During 2004, the Union-Management Committee held scheduled bimonthly meetings in January, March, July, and September, as well as on November 16.   The scheduled May meeting was cancelled due to collective bargaining negotiations.  The has submitted affidavits of two Union members of the Committee, James Parent and Mark Hebert, who claim that the Company did not make the required Letter 21 disclosures to Union Committee members during the 2004 meetings. The parties agree that the actual sufficiency of the disclosures is not a material fact for the purposes of the motions for summary judgment, as the plaintiff is seeking merely to have that issue decided at arbitration.

On November 5, 2004, the Company notified the Union, pursuant to CBA Article 28, of its intent to relocate the Precision Machining Facility (PMF) out of the Company's facility in Windsor Locks, Connecticut, a move that would result in a loss of about 75 bargaining unit jobs.  The Company gave the Union written notice of its intention to

---

[2]Counsel for the Company conceded this point at oral argument.

[3]The Letters of Agreement included in the copy of the CBA that the Company provided to the Court do not include signatures by Union Representatives, but they do include the words "Accepted this [blank] day of [blank]," followed by several signature lines.  In light of the parties' agreement that the letters were accepted and countersigned by the Union, the Court assumes that the Letters attached to the original copy of the CBA included countersignatures.

8

move the PMF out of Windsor Locks on November 8, 2004.  The body of the letter

stated,

> On Friday, November 5, 2004, the Company notified the union of its intent
> to relocate PMF components out of Windsor Locks, CT.  Pursuant to
> Article 28 of our collective bargaining agreement, this work will result in a
> decrease of approximately 78 bargaining unit employees.  The PMF will
> be phased out over a number of months.  The Company anticipates the
> movement of work to begin early in the third quarter of 2005.
>
> Article 28 also calls for a maximum 45-day period for the Company and
> Union to meet and confer regarding the effects of this decision on the
> bargaining unit employees.  We are ready to meet beginning November
> 8th, or as soon as practical thereafter.

Bogue Decl. Ex. B [Dkt. # 20]. On the same day, the parties met, pursuant to Article 28,

to discuss the reasons for the transfer of the work, the impact on bargaining unit

members, and any possibility that the work could remain within the bargaining unit.  At

this meeting, the Company told the Union that the primary reason for the relocation was

the cost of performing the work.  The Union claims that Tony Flippo ("Flippo"), Director

of Operations for OEM, stated that productivity would need to improve by 50% to make

the area competitive, although the Company does not concede that he provided a

particular percentage.  The Union further claims that Flippo confirmed at the meeting

that studies had been conducted in relation to the PMF work transfer, but that the Union

never received such studies from the Company.  The Company denies these facts.

Also on November 8, 2004, the Union filed grievance number UG2004-24

("Grievance").  The "Statement of Grievance and Facts Involved" appearing therein

read,

> Hamilton Sundstrand has announced the move of the PMF job ladder 203
> to another non-bargaining unit facility thereby impacting approximately 77
> bargaining unit employees without first discussing with the Union, despite

multiple requests, any problems affecting productivity, competitiveness, or job security in that area as agreed to in Letter 21 of the CBA.  This serious violation of the agreement has stripped the bargaining unit committee of their right to study and recommend various cooperative approaches to enhance competitiveness, productivity and thus job security as was the prescribed intentions during contract negotiations of 2004.

Plf.'s Local R. 56a1 Statement, Ex. 6 [Dkt. No. 27].  The Union requested the following remedy: "Cease and Desist this practice, retract the directive of relocating this work, and discuss with the Union any and all problems affecting productivity, competitiveness, or Job Security as agreed to in Letter 21."  Id.  The "Violation Claimed" section of the grievance form contains the words "Letter 21," although the other words in this section are not legible on the copy provided to the court.  Union President Mark Hebert ("Hebert"), who filed the grievance, states in his Affidavit that he did so because the Union believed the Company was violating Letter 21.  Hebert Aff. at ¶ 14.

On November 10, 2004, the parties met again as part of the Article 28 meet and confer process.  On the same day, the Union sent a letter to the Company requesting a meet and confer session pursuant to Article 28 and specific information regarding the transfer of work.  Bogue Decl., Ex. C [Dkt. No. 20].  The Company responded on November 15 with a letter detailing the information it had already provided and refusing to provide further information.  Bogue Decl., Ex. D [Dkt. No. 20].

A regularly scheduled Letter 21 Committee meeting was held on November 16, 2004.  The parties held meetings regarding the grievance on December 2 and 16, 2004.  On December 2, they stated their respective provisions on the grievance and which CBA provision the grievance was to address.   On December 16, the Company formally denied the grievance.

The Union sent another letter to the Company on December 21, asking that the Article 28 meet and confer period be extended through January 21.  Bogue Decl. Ex. E. On the same day, the Union sought to have the Grievance arbitrated.  The Company declined to extend the meet and confer period and refused to arbitrate the Grievance. On January 5, 2005, the parties executed an agreement discussing severance packages to be offered as a result of the PMF relocation.

## IV. DISCUSSION

Several long-standing principals govern the arbitrability of disputes among parties to collective-bargaining agreements.  The question of whether a dispute is arbitrable is one for judicial determination.  AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649 (1986).  However, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."  Id.   "When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal."

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." AT & T, 475 U.S. at 648. Under the Federal Arbitration Act, 9 U.S.C. § 1 et. seq. (1994) ("Arbitration Act"), however, the court must give due regard to the federal policy favoring arbitration and must resolve ambiguities as to the scope of an arbitration clause in favor of arbitration. Volt Information Sciences, Inc. V. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989); Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading

Inc., 252 F.3d 218, 223 (2d Cir. 2001) (quoting Moses H. Cone Mem'l Hosp. V. Mercury

Constr. Corp., 460 U.S. 1, 24-25 (1983)).  "The purpose of the Federal Arbitration Act

'was to make arbitration agreements as enforceable as other contracts, but not more

so.'"  McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d

825, 831 (2d Cir. 1988) (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388

U.S. 395, 404 n. 12 (1967)).

**A.  The Arbitration Clause is Broad.**

A court should begin an arbitrability analysis by classifying the arbitration clause

at issue as "broad" or "narrow," albeit "recognizing there is some range in the breadth of

arbitration clauses."  Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252

F.3d 218, 224 (2d Cir. 2001). A "broad" arbitration clause gives rise to a "presumption

of arbitrability" for any claim that "implicates issues of contract construction or the

parties' rights and obligations under it."  Id. (internal citations omitted).  If an arbitration

clause is "narrow," a dispute will generally be arbitrable only if it concerns an issue that

"is on its face within the purview of the clause."  Id.

> No fixed rules govern the determination of an arbitration clause's scope;
> while very expansive language will generally suggest a broad arbitration
> clause, see, e.g., Collins [& Aikman Prods. Co. v. Bldg. Sys., Inc.], 58
> F.3d [16,] 18 [(2d Cir. 1995)] ("Any claim or controversy arising out of or
> relating to this agreement shall be settled by arbitration"), [the Second
> Circuit has] also found broad clauses when examining phrasing slightly
> more limited, see, e.g., Abram Landau Real Estate v. Bevona, 123 F.3d
> 69, 71 (2d Cir. 1997) ("Contract Arbitrator shall have the power to decide
> all differences arising between the parties to this agreement as to
> interpretation, application, or performance of any part of this agreement.").
> In the end, a court must determine whether, on the one hand, the
> language of the clause, taken as a whole, evidences the parties' intent to
> have arbitration serve as the primary recourse for disputes connected to
> the agreement containing the clause, or if, on the other hand, arbitration
> was designed to play a more limited role in any future dispute.

12

Id. at 225 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). In determining the parties' intent, "[s]pecific words or phrases alone may not be determinative although words of limitation would indicate a narrower clause. The tone of the clause as a whole must be considered." Prudential Lines, Inc. v. Exxon Corp., 704 F.2d 59, 64 (2d Cir. 1983).

The CBA's arbitration clause is not unlimited, nor need it be unlimited to be classified as broad. Louis Dreyfus Negoce, 252 F.3d at 225. The court finds that the language of the arbitration clause, albeit not the most expansive language possible,[4] evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the CBA.

The language of the clause bears significant similarities to that in the AT & T collective-bargaining agreement. The Supreme Court held in AT & T that a CBA clause was broad where it provided for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder." 475 U.S. at 645. The AT & T clause required exhaustion of grievance procedures prior to an arbitration demand, and it expressly did not cover disputes "excluded from arbitration by other provisions of this contract." Id. at 645 n. 1. Another clause in the AT & T collective-bargaining agreement stated:

> The Union recognizes the right of the Company (subject to the limitations
> contained in the provisions of this contract, but otherwise not subject to
> the provisions of the arbitration clause) to exercise the functions of

---

[4]Contrast, for example, the clause in JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004), which was broader than the present clause. The JLM Indus. clause stated, "Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration," and it did not contain further subject matter limitations.

managing business which involve, among other things, the hiring and placement of Employees, the termination of employment, the assignment of work, the determination of methods and equipment to be used, and the control of the conduct of work.

Id. at 645 n.2.

Like the AT & T clause, the present CBA's arbitration clause applies, with specified exceptions, to any "difference [that] arises between the company, the Union or any employee concerning the interpretation, application or compliance with the provisions" of the CBA,  CBA Art. 7 § 1,  Bogue Decl. Ex. A [Dkt. No. 20], once the complaining party has exhausted certain procedural requirements yet failed to reach a settlement, id. Art. 7 § 3.   Contrary to the Company's argument, AT & T demonstrates that a broad clause may contain such procedural exhaustion requirements.[5]

The Company's argument that the CBA's arbitration clause is narrow because it contains express exceptions for grievances arising under Articles 1 and 28 also fails. The court finds no legally significant difference between the express exceptions for Articles 1 and 28 and the AT & T agreement's express exclusion from arbitration of grievances so excluded by other provisions of that contract.  The CBA excludes grievances arising under only two articles from arbitration, whereas the entire agreement contains twenty-nine articles and twenty-seven letters of agreement. Viewed in context, the exclusions are not significant enough to suggest that the parties intended otherwise than that arbitration form the primary recourse for disputes arising under the contract.

_____

[5]Even if the Second Circuit's decision in New York News, Inc. v. Newspaper Guild of New York, 927 F.2d 82 (2d Cir. 1991) would suggest that CBA's arbitration clause was narrow because it limits arbitrable issues to contractual grievances and includes procedural exhaustion requirements, the court would find that the Grievance clearly falls within the purview of the arbitration clause.  That is, the Grievance would be arbitrable even if the arbitration clause were narrow.  Part IV.B, infra.

The Company further argues that the clause is narrow because it expressly states that "no other disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation or application of the provisions of this Agreement shall be submitted to any Arbitrator for decision." CBA Art. 7 § 3(c), Bogue Decl. Ex. A [Dkt. No. 20].  However, the Company's quotation from section 3(c) omits the phrase that precedes this language in the CBA:  "[e]xcept for the grievances which can be arbitrated under Sections 3(a) and 3(b) of this Article." Id.  Section 3(a) is the mandatory arbitration clause quoted above, and section 3(b) additionally allows for arbitration of "[o]ther grievances arising under this contract which are not settled [following the earlier procedural steps" upon mutual agreement by the Company and the Union.  Together, sections 3(a) and (b) would cover all substantive provisions of the CBA, including the Articles excluded from arbitration by 3(b).  Thus, the above-quoted limitation on arbitration in section 3(c) prevents arbitration only of unexhausted contractual grievances.  As discussed above, procedural exhaustion requirements do not render an arbitration clause narrow.

The Company also argues that the CBA's arbitration clause is narrow because it distinguishes between mandatory and non-mandatory arbitration.  Given the breadth of the mandatory arbitration provision, the court does not find that this distinction renders the entire clause narrow.

The Company then draws the court's attention to the Article 7 section 3(e) statement that the Arbitrator shall not "have jurisdiction in any case submitted to arbitration to affect in any way, directly or indirectly, by any decision or in any other manner, the right and responsibility of the Company to direct its operations . . ."  This

15

clause does limit the power of an arbitrator, but it refers to the Arbitrator's actions in cases already submitted to arbitration.  It appears intended to address his or her authority to issue particular remedies, rather than true "jurisdiction" to review the case. It does not suggest that the parties intended a narrow arbitration clause.  Moreover, the AT & T CBA also contained a management rights clause.  Although that clause was subject to "the limitations contained in the provisions of [the AT & T] contract," it stated that the company's management rights were not otherwise subject to arbitration.  The Supreme Court found the arbitration clause to be broad despite the management rights clause.  The Company cites no case that would suggest that such a clause was enough to render the arbitration clause narrow.

Finally, the CBA's arbitration clause contains no language comparable to that of the narrow clause examined in Int'l Ass'n of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. General Electric Co., 865 F.2d 902 (7th Cir. 1989), which stated that it "shall be construed according to the understanding of the parties that they do not intend that arbitration shall be a means of deciding all disputes which may arise between them during the term of this agreement . . . but shall be subject to arbitration only those disputes which the parties have specifically and plainly agreed to arbitrate as provided above."  Id. at 904.  In contrast, the CBA's arbitration clause is phrased in a positive manner, carving out exceptions from a general rule of arbitrability for contractual disputes.  For all of the reasons above, the court concludes the CBA's arbitration clause is broad.

**B. The Grieved Issue is Arbitrable.**

Where an arbitration clause is broad, district courts must compel arbitration "whenever a party has asserted a claim, however frivolous, that on its face is governed by the contract." Peerless Imps., Inc. v. Wine, Liquor & Distillery Workders Union Local One, 903 F.2d 924, 927 (2d Cir. 1990) (internal citation omitted).  Having found that the arbitration clause is broad, the court finds that the presumption of arbitrability applies because the grievance "implicates issues of contract construction or the parties' rights and obligations under it." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001) (internal citations omitted).  In particular, it implicates the parties' rights and obligations under Letter 21.  Even if the arbitration clause had been narrow, however, the court would nevertheless find the Grievance arbitrable.  The Grievance concerns an issue that "is on its face within the purview of the [arbitration] clause," and thus would be arbitrable regardless of whether the court applies the presumption accorded in cases with broad arbitration clauses.

The Company does not dispute that the Grievance has followed the requisite procedural route to arbitration.  The parties' primary disagreement concerns subject matter: if the Grievance in fact complains of a violation of Letter 21, the Company would have an obligation under the CBA to submit the grievance to arbitration,[6] whereas if it complains of a violation of Article 28, the Company would lack such an obligation because the arbitration clause expressly excludes Article 28 disputes.

---

[6] The Company "concedes that, if the Union had submitted a grievance simply alleging that the Company failed to furnish required specific information to the Letter 21 Committee (after being properly requested to do so), the Union could submit that issue to arbitration under the CBA." Def.'s Mem. Opp. Plf.'s Mot. Summ. J. and Reply Mem. Supp. Def.'s Mot. Summ. J. 11-12 [Dkt. No. 30].  The Company also conceded at oral argument that Letter 21 is subject to the grievance procedure.

17

The parties agree that "[i]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, [the court must focus] on the factual allegations in the complaint rather than the legal causes of action asserted." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840 (2d Cir. 1987) (reviewing scope of agreement in the context of a stay of arbitration); see Morristown Daily Record, Inc. v. Graphic Communications Union, Local 8N, 832 F.2d 31, 34 (1987) (noting that the phrasing of a grievance does not control its arbitrability) (citing E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters, 812 F.2d 91 (3d Cir. 1987)).

Although the facts alleged by the Grievance could violate Article 28 – and such a violation would not be arbitrable – the Grievance may also be read to state a violation of Letter 21.  Letter 21, by its terms "confirm[s] the understanding and agreement between the Company and the Union concerning job security issues in an environment of business growth and change."  Letter 21 requires that the Company grant the Committee "access to information concerning manufacturing costs, productivity, scheduling, business and staffing plans affecting the bargaining unit and such other information as mutually deemed relevant by the parties."  Without reaching the merits of its complaint, the court finds that the Grievance does allege a violation of that access obligation. The Grievance complains that the Company failed to discuss with the Union "any problems affecting productivity, competitiveness, or job security [in relation to the work relocation] as agreed to in Letter 21 of the CBA."  Although the Letter 21 access obligation requires the Company to share information with the Committee rather than the general Union membership, Letter 21 also requires that the Committee include Union members. Thus, the complaint that the Company failed to share information with

18

the "Union" is consistent with a grievance of a Letter 21 violation.

The court does not find the timing of the grievance dispositive of its substance. The fact that the grievance occurred shortly after the Company stated its intent to relocate work out of the bargaining unit facility as required under Article 28 and nearly eight weeks after the previous Letter 21 Committee meeting does not preclude the possibility that it pertained to a violation of a Letter 21 obligation.  The timing does suggest that the grievance was motivated in part by the Article 28 relocation announcement.  However, it was that announcement that caused the Union to conclude the company had not abided by its Letter 21 obligations.  Thus, the timing is consistent with a Letter 21 grievance.

The Company further urges that the remedy requested by the Grievance shows that it is in fact grieving a violation of Article 28 rather than Letter 21.  At oral argument, however, counsel for the Union represented that the Grievance had been written by non-lawyers, and that the Union was withdrawing its request that the Company retract its directive of relocating work.  Thus, the Company's argument is moot as to that aspect of the remedy.  Moreover, even if the Union had not withdrawn this remedy request, the court would not decide whether the arbitrator can grant the requested remedy, because that would involve a decision on the merits of the Grievance.  See Carey v. General Electric Co., 315 F.2d 499, 507-508 (2d Cir. 1963).  As the Second Circuit explained,

> Arbitration may well contribute to industrial peace even if it results in the arbitrator's determination that he can make no valid award because of the limitations upon his authority, or that the employee has no case on the merits. . . . We cannot divine now, nor do we deem it proper to predict, the precise form in which the arbitrator will frame his decree. We merely hold

19

that in each of the grievances under discussion, he has the jurisdiction to reach a decision on the merits. Should his decision or the remedy exceed the bounds of his authority as established by the collective bargaining agreement, that abuse of authority is remediable in an action to vacate the award.  That question is for another day.

Carey, 315 F.2d at 508 (citing United Steelworkers of America v. American Mfg. Co., 363 U.S. 564 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960); International Ass'n of Machinists v. Hayes Corp., 296 F.2d 238, 244 (5th Cir. 1961)) (internal quotation marks omitted).

Insofar as the Company suggests that the court should view the requested remedy to "Cease and Desist this practice" and "retract the directive of relocating this work" as evidence that references to Letter 21 in the text of the Grievance were made in bad faith and the Grievance was truly about the relocation, the court declines to do so.  Consistent with an argument that the Company failed to comply with its obligation under Letter 21, the Union in good faith might have requested that the Company retract its directive of relocating work until it has complied with the Letter 21 obligations.  The request to "Cease and Desist this practice" could reasonably have been referring to the Company's practice of not abiding by Letter 21.  Moreover, although the Third Circuit opinion Graphic Communications Int'l Union, Local 735-S v. N. Am. Directory Corp., 98 F.3d 97 (3d Cir. 1996), bears many similarities to the present case, the court finds it distinguishable.  The union in Graphic Communications sought an affirmative change of medical insurance plan, which the Third Circuit viewed as a matter excluded from arbitration by a particular CBA clause. In the present case, the Union complains that the Letter 21 process was not followed and requests that the decision that was made in the absence of this process be retracted (a request since withdrawn).  The court does not

20

decide whether this remedy would in fact be available in an arbitration, but it does decide that failure of the Company to follow the Letter 21 procedures is a grievable matter. In light of the Supreme Court's instruction to "resolve ambiguities as to the scope of an arbitration clause in favor of arbitration," Volt Information Sciences, Inc. V. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989); Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 223 (2d Cir. 2001) (quoting Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)), the court finds that the substance, as well as form, of the Grievance falls within the purview of the arbitration clause.

Finally, the court must address the effect of Article 7, section 3(e) of the CBA, which deprives an arbitrator of the authority:

> to affect in any way, directly or indirectly, by any decision or in any other manner, the right and responsibility of the Company to direct its operations; to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the schedules of production; shift schedules and hours of work . . .

Bogue Decl. Ex. A [Dkt. No. 20]; see also CBA Art. 1 ("Management Functions"), id. at 2; CBA Art. 3(a) (expressly exempting Article 1 disputes from arbitration).  As the Company points out, these limits apply to all grievances.  Cf. General Electric, 865 F.2d at 905-06.  However, as discussed above, they are not truly jurisdictional, because they limit remedies rather than the Arbitrator's power to hear the case in the first instance. An arbitrator could – and must – rule on the Grievance, even if he or she were to find in the Union's favor, without overstepping the limitation imposed by Article 7 Section 3(e). The grievance itself does not exceed the arbitrator's jurisdiction.  Whether the Union requested a remedy greater than the arbitrator is permitted to provide under that section

21

is a question to be decided at arbitration.

The court finds no genuine issue of material fact regarding the arbitrability of the Grievance. Based on the undisputed facts and the reasoning above, the Grievance is subject to arbitration.

## V. CONCLUSION

For the foregoing reasons, the court GRANTS the plaintiff's Motion for Summary Judgment **[Dkt. No. 25]** and DENIES the defendant's Motion for Summary Judgment **[Dkt. No. 18]**.  The clerk is ordered to enter judgment in favor of the plaintiff and close the case.  The parties may move to reopen the case after the arbitration, if needed, upon motion made within 21 days of the arbitrator's ruling.

**SO ORDERED**.

Dated at Bridgeport, Connecticut this 30th day of November, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge